UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                                      Case No:  2:13-cr-20-FtM-29DNF

JERRY WARD

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

   **I.   Introduction**

This cause is before the Court on Defendant Jerry Ward's ("Defendant") Motion to Suppress Evidence (Doc. 38) filed on March 11, 2014.  The Government filed a Response in Opposition to Defendant's Motion to Suppress Evidence (Doc. 47) on March 24, 2014.  Defendant is charged with one count of possessing ammunition while being a person convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 28 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).  Defendant is seeking to have the Court suppress the following items of evidence: (1) two .45 caliber bullets; (2) any statements made by Defendant; (3) any observations made by law enforcement; and (4) any other evidence uncovered as a result of the illegal detention and subsequent illegal search of Defendant. (Doc. 38 p. 1).  This matter was referred to the Court for a report and recommendation and an evidentiary hearing was held before the undersigned on March 31, 2014.  For the reasons explained below, the Court respectfully recommends that Defendant's Motion to Suppress Evidence be **DENIED**.

## II.     Hearing Testimony

Deputy Bryson Clark of the Lee County Sheriff's Office and Defendant testified at the hearing. Their testimony differed in key aspects. The Court will summarize the testimony of each witness separately.

### A. Deputy Clark's Testimony

Deputy Clark testified that he has been employed as a road patrol deputy with the Lee County Sheriff's Department for seven years. (Tr.[1] 4). Prior to this he had one year of law enforcement experience with Ray County, Tennessee, and before that he was the owner of a construction business. (Tr. 4).

Deputy Clark testified that on June 14, 2012, at approximately 9:00 a.m., while travelling southbound in his patrol car during the morning, he observed Defendant walking northbound on Broadway. (Tr. 4-6, 11-12). Defendant was carrying a pillowcase which appeared to be full of some heavy items. (Tr. 5). After he passed Defendant, Deputy Clark continued to observe Defendant from his rearview window and noticed that Defendant continued to look backwards at the patrol car. (Tr. 5).

Deputy Clark turned his patrol car around, drove behind Defendant, who was walking on the east side of the road, and pulled over approximately five to ten feet behind Defendant. (Tr. 5). Defendant then stopped and turned towards him. (Tr. 5). Deputy Clark got out of his vehicle and met with Mr. Ward at the passenger front of Deputy Clark's patrol car. (Tr. 5).

Deputy Clark testified that he decided to pull up behind Defendant because Defendant was walking in a high crime area, the way Defendant was looking at him, and because he had

---

[1] "Tr." refers to the Transcript (Doc. 50) of the hearing filed on April 10, 2014.

had one or two encounters previously with Defendant. (Tr. 5). Deputy Clark testified that Defendant had a reputation among law enforcement. (Tr. 5-6).

After stopping his patrol car, Deputy Clark exited his vehicle and went to the passenger right front of the patrol car. (Tr. 6). Defendant walked towards the patrol car. (Tr. 6). Deputy Clark asked Defendant where he was coming from and what he was doing in the area. (Tr. 7). Deputy Clark testified that Defendant was not giving any clear answers. (Tr. 7). Deputy Clark then asked Defendant what he had in the pillowcase. (Tr. 7). Upon being asked what was in the bag, without saying anything Defendant just turned the pillowcase and dumped all the items on the hood of Deputy Clark's patrol car. (Tr. 7). Deputy Clark did not touch Defendant or the bag in any way at the time that Defendant dumped the contents of the pillowcase onto the hood of the patrol car. (Tr. 7).

Deputy Clark testified that after Defendant dumped the pillowcase out on the hood of his car, he could see a laptop, hair clippers in a case, and a magazine with a round of ammunition on the top. (Tr. 7). The magazine was from a semi-automatic, was about six inches long and was chrome colored. (Tr. 7). Deputy Clark testified that he could tell there was a round in the magazine as it sat on the hood of the car. (Tr. 7).

Upon seeing the magazine, Deputy Clark handcuffed Defendant for safety reasons and conducted a pat-down search to make sure that he didn't have any weapons. (Tr. 8). Deputy Clark did not find any weapons on Defendant upon performing the pat-down search. (Tr. 8). Deputy Clark returned to his vehicle and ran Defendant's name through the NCIC/FCIC database and learned that Defendant was a registered convicted felon. (Tr. 8). Deputy Clark had found Defendant in the system because Defendant had previously given his name and date of birth. (Tr. 8). After finding out that Defendant was a convicted felon, Deputy Clark checked to make sure

that none of Defendant's rights had been restored. (Tr. 8).  Deputy Clark learned that Defendant's right to vote had been restored but that he was still not allowed to possess a firearm. (Tr. 8-9).

Deputy Clark could not recall the nature of his previous encounters with Defendant, but only that he come across Defendant when checking in on other officer's stops to see if they were okay. (Tr. 9).  Deputy Clark testified that he was unaware of Defendant's criminal history when he turned his vehicle around. (Tr. 9).  After running his Defendant's history, Deputy Clark learned that Defendant had multiple charges for burglaries and narcotics or paraphernalia charges. (Tr. 9-10).

Deputy Clark read Defendant his Miranda rights and tried to ascertain where Defendant had acquired the items in the pillowcase. (Tr. 10).  Defendant stated that he had got the items in the bag from his home boy. (Tr. 10).  Defendant stated that he dumped the items on the police car because Deputy Clark was going to make him do so anyways. (Tr. 10).  Deputy Clark testified that Defendant seemed to be in an excited, agitated state, which based on his experience, lead him to believe Defendant was under the influence of cocaine. (Tr. 10).  This became apparent to Deputy Clark almost instantaneously upon encountering Defendant. (Tr. 10).

On cross examination, Deputy Clark testified that he did not suspect Defendant of committing a crime while he was still in his patrol car. (Tr. 11).  There were no burglary calls in the areas and Deputy Clark was not investigating any specific robberies or complaints about missing property. (Tr. 11).  Deputy Clark testified that he did not know that Defendant's nickname was "Chicken." (Tr. 12).  Deputy Clark testified that he had never directly investigated Defendant. (Tr. 12).  Deputy Clark acknowledged that he had testified during a previous deposition that he has had one or two encounters with Defendant in the past. (Tr. 12).  Deputy Clark explained that he had no direct contact with Defendant but had been out at stops with the

City where Defendant was walking in the area. (Tr. 13). Deputy Clark testified that he did not know that Defendant had a reputation for being a burglar until he searched his name. (Tr. 13). Deputy Clark testified that he did not think Defendant had committed a burglary when he saw Defendant, but did think it was somewhat odd seeing Defendant with the pillowcase in a high crime area. (Tr. 13).

Upon being asked to define what a high crime area is, Deputy Clark could not provide statistics but responded that it's a high drug, prostitution area, and that the city was having a rash of burglaries in the area where he encountered Defendant. (Tr. 13). Deputy Clark testified that he did not believe that Defendant had committed a crime at the time he pulled up behind him. (Tr. 14). Deputy Clark testified that he did not believe that he had hit his siren a single time to make a "whoop" sound to get Defendant's attention. (Tr. 15). Deputy Clark testified that he pulled his patrol car behind Defendant and not in front of him. (Tr. 15). The location where Deputy Clark pulled over was just south of the intersection of Broadway and Stella. (Tr. 15). Deputy Clark parked his patrol car on a section of grass between the road and sidewalk. (Tr. 16).

Deputy Clark testified that he pulled onto the right side of the road, parked his vehicle, left it running, exited the vehicle and made contact with Defendant. (Tr. 16). Deputy Clark asked Defendant for an ID when he dumped his pillowcase onto the hood of Deputy Clark's patrol car. (Tr. 16-17). Deputy Clark testified that he did not react to Defendant dumping his pillowcase onto the hood of his car than in any other way than placing Defendant in handcuffs after seeing the magazine. (Tr. 18). Deputy Clark testified that the first item he saw come out of the bag was a laptop computer and the second item he noticed was the magazine. (Tr. 18).

Deputy Clark testified that he could not recall if the magazine had a slit down the center where he could see how many bullets are in it. (Tr. 19). Deputy Clark stated that he could see a

bullet resting on the top of the magazine. (Tr. 19). Deputy Clark testified that all of the items dumped onto the hood of his car remained on the top of his car's hood. (Tr. 20).

Deputy Clark testified that he placed Defendant in handcuffs as a safety precaution to make sure he didn't have a firearm that went with the magazine. (Tr. 20). Deputy Clark was concerned about a firearm because, although the magazine was obviously not in the gun, a bullet could still potentially be in a gun's chamber. (Tr. 21). Deputy Clark performed a pat-down of Defendant after handcuffing him and found nothing else. (Tr. 21). Deputy Clark did not place Defendant inside his patrol car, but kept him outside. (Tr. 22). Another officer arrived and at most there were only ever two officer's on the scene. (Tr. 22). Deputy Clark testified that Defendant appeared to be in an agitated state because he was hyper, sweating profusely and grinding his teeth. (Tr. 24).

On redirect, Deputy Clark testified that from his perspective, Defendant was free to leave if he wanted to up until the point when he dumped the magazine onto the hood of his patrol car. (Tr. 26).

Upon further examination by Defendant's counsel, Deputy Clark testified that in his written report of the incident he referred to Defendant as a "known burglary suspect." (Tr. 38). Deputy Clark testified that he included this information because it was stated in the local records, not because he believed Defendant had committed a burglary the day of the incident. (Tr. 39).

### B. Defendant's Testimony

Defendant testified that on June 14, 2012, he was walking northbound on Broadway. (Tr. 28). Defendant noticed Deputy Clark about five, six blocks away. (Tr. 28). Deputy Clark passed by him going southbound, slowed down, and then turned around behind him. (Tr. 28). Defendant looked back at Deputy Clark's patrol car trying to figure out what was going on, but continued

on his way. (Tr. 29). After Deputy Clark turned his patrol car around, he hit his siren, making a "whoop" sound[2] and then pulled his patrol vehicle in front of Defendant. (Tr. 29). Deputy Clark got out of his patrol and said, "Chicken, come here." (Tr. 29).

Defendant testified that he couldn't go in the front of Deputy Clark's patrol car because it was blocking his path, and instead went around the back. (Tr. 29). Defendant met Deputy Clark at the back of the patrol car near the vehicle's trunk. (Tr. 29). Deputy Clark grabbed the pillowcase from Defendant's shoulder and asked, "What's in this bag, this pillowcase? Where are you coming from with it? Where you going with it?" (Tr. 29, 30). While Defendant was answering, Deputy Clark was looking into the pillowcase and moving it around, trying to see what was inside. (Tr. 29). Defendant testified that he did not give Deputy Clark permission to grab the pillowcase like he did. (Tr. 30).

While he was looking through the pillowcase, Defendant explained to Deputy Clark about the items inside. (Tr. 30). Deputy Clark looked at Defendant and asked, "Really? Whose stuff is this?" (Tr. 31). Defendant explained that the items where his and explained where he got the items. (Tr. 31). Deputy Clark took the bag from the rear of his patrol car to the hood of his car. (Tr. 31). Deputy Clark placed the pillowcase on the hood of his patrol car and began removing items. (Tr. 31). Defendant stated that he was standing over Deputy Clark's shoulder looking at the pillowcase while Deputy Clark was removing items. (Tr. 31). Defendant testified that the first item taken out was the laptop computer. (Tr. 31). Deputy Clark instructed Defendant to back around the car and have a seat on the sidewalk, which Defendant did. (Tr. 31). At this time, other officers pulled up and they were looking through his stuff. (Tr. 31).

---

[2] At the hearing, Defendant testified that he had disclosed this fact to Defendant's counsel prior to the filing of the instant Motion to Suppress Evidence, but that Defendant's counsel failed to include this fact in the motion.

Defendant testified that during this time the officers were looking at the magazine. (Tr. 31). After finding the magazine, Deputy Clark went to his vehicle, used his computer, and then came around and asked Defendant if he had registered as a felon. (Tr. 31). Defendant testified that he told Deputy Clark that he had registered when he had gotten out of prison a few years earlier, but did not know he had to register every year. (Tr. 31). Defendant testified that he was then handcuffed and told that he was under arrest for possessing bullets. (Tr. 31). Defendant denied that the bullets were his and was then placed in the patrol car. (Tr. 32).

On cross examination, Defendant testified that he could not recall the number of his criminal felonies. (Tr. 32). The Government asked Defendant if he recalled a telephone conversation from the jail where he was speaking with someone and said that he saw the police coming down the street, and that he hid "it"—referring to the gun that he had—but had forgotten about the bullets in his pocket. (Tr. 32). Defendant testified that he could not recall such a conversation. (Tr. 32). Defendant testified that he initially stopped upon hearing the "whoop" sound from Deputy Clark's patrol car. (Tr. 33). Defendant testified that he could not approach the front of Deputy Clark's patrol car because Deputy Clark had parked in such a way that his path was blocked. (Tr. 33). Defendant testified that he was not under the influence of anything the morning in question and was not grinding his teeth. (Tr. 36).

### III.  Analysis

Defendant asserts four grounds for suppression in his Motion to Suppress Evidence. First, Defendant argues that he was stopped and illegally detained by Deputy Clark without probable cause or reasonable suspicion of criminal activity. (Doc. 38 p. 2). Second, Defendant argues that his pillowcase was illegally searched by Deputy Clark. (Doc. 38 p. 2). Third, Defendant argues that even if the Court finds he voluntarily consented to the search by dumping out the items in

the pillowcase, that consent was tainted by the illegality of the detention. (Doc. 38 p. 2). Fourth, Defendant argues that even if the Court finds that he voluntarily consented to the search by dumping out the items in the pillowcase, Deputy Clark commenced an illegal seizure and search by picking up and inspecting the silver magazine containing the .45 caliber bullets. (Doc. 38 p. 2). The Court will address each grounds for suppression in turn.

### A. Whether Defendant was stopped and illegally detained by Deputy Clark without probable cause or reasonable suspicion of criminal activity

Defendant argues that his interaction with Deputy Clark was not a voluntary citizen encounter, but rather an illegal investigatory stop which turned into an illegal detention. (Doc. 38 p. 6). According to Defendant, no probable cause, let alone reasonable suspicion, supported Deputy Clark's investigatory stop of Defendant. (Doc. 38 p.7). Defendant contends that because there was no reasonable suspicion or probable cause to support Deputy Clark's actions, any evidence recovered afterwards is tainted and should be suppressed as "fruit of the poisonous tree." (Doc. 38 p. 7).

The Government responds that until Deputy Clark handcuffed Defendant after seeing the magazine with bullets in it, Defendant was not detained and was free to answer or not answer Deputy Clark's questions, or to walk away at any time. (Doc. 47 p. 5). The Government argues that once Deputy Clark saw the bullets in the magazine, he became justified in detaining Defendant by putting him in handcuffs for his own safety, and to pat him down to make sure he was not concealing any weapons. (Doc. 47 p. 6).

The Fourth Amendment, which is applicable to the states through the Fourteenth Amendment, protects individuals from unreasonable searches and seizures. *United States v. Davis,* 313 F.3d 1300, 1302 (11th Cir. 2002). "Evidence that is uncovered as the result of an unreasonable search or seizure must be suppressed as 'fruit of the poisonous tree.'" *United States*

*v. Hunter,* 373 F.App'x 973, 976 (11th Cir. 2010) (citing *Mapp v. Ohio,* 367 U.S. 643, 655 (1961)). "There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; (3) full-scale arrests." *United States v. Perez,* 443 F.3d 772, 777 (11th Cir. 2006).

Police-citizen exchanges that involve no coercion or detention do not implicate the Fourth Amendment scrutiny. *Id.* (citing *United States v. Espinosa-Guerra,* 805 F.2d 1502, 1506 (11th Cir. 1986). "Officers are free, without any level of suspicion, to approach citizens on the street or in a public place and ask them questions, request proof of identification, and a consent to search." *Miller v. Harget,* 458 F.3d 1251, 1257 (11th Cir. 2006) (citing *Perez,* 443 F3d at 777); *see also Florida v. Royer,* 460 U.S. 491, 497 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering evidence in a criminal prosecution his voluntary answer to such questions"). As the Supreme Court explained in *United States v. Mendenhall*,

> [t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

446 U.S. 544, 553-554 (1980). Thus, so long as a reasonable person would feel free to terminate his or her encounter with a police officer, then he or she has not been seized. *Perez,* 443 F.3d at 777-778. The Eleventh Circuit has applied numerous factors in determining whether a reasonable person would feel free to terminate an encounter with a police officer. *Miller* 458 F.3d at 1257.

Such factors include: whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police. *Id.* (citing *Perez,* 458F.3d 778).

If the encounter between Deputy Clark and Defendant was not a police-citizen encounter without any coercion or detention, the Court must proceed to determine whether the encounter constituted a lawful seizure or investigatory encounter. According to *Terry v. Ohio,* 392 U.S. 1, 21-23 (1968), the Fourth Amendment permits an officer to stop and briefly detain a person for investigative purposes if the officer has a reasonable, specific, and articulable suspicion that criminal activity is afoot. "In legal parlance, such seizures are known as '*Terry* stops.'" *United States v. Santibanez Garcia,* 132 F.Supp. 1338, 1344 (M.D. Fla. 2000) (citing *United States v. Puglisi*, 723 F.2d 779, 784 (11th Cir. 1984)).

In this case, the Court is confronted with conflicting versions of the encounter between Deputy Clark and Defendant. According to Deputy Clark, he approached Defendant from behind, asked Defendant where he was going and where he was coming form, and Defendant, without being told to do so, dumped the contents of the pillowcase onto the top of Deputy Clark's patrol car. Deputy Clark did not touch the contents that were placed on the hood, but immediately noticed that a magazine containing at least one bullet was among the contents of the pillowcase dumped on the hood. Deputy Clark handcuffed Defendant and then searched his name in NCIC/FCIC database. After finding out that Defendant was a felon, he arrested Defendant for being a felon in possession of ammunition.

Defendant's version of events differs in several key aspects. Defendant testified that Deputy Clark used his patrol car's siren to make a "whoop" sound, then pulled his patrol car in

front of Defendant and said, "Chicken, come here." Defendant testified that he met Deputy Clark at the rear of his vehicle and that Deputy Clark grabbed the pillowcase out of Defendant's grasp and began looking inside it and moving the pillowcase to see the contents within. Defendant testified that multiple officers arrived and searched through the contents of his pillowcase. Defendant testified that Deputy Clark began taking out items from the pillowcase, first his laptop, then the magazine. After finding the magazine, Defendant was handcuffed and placed under arrest.

The difference in Deputy Clark and Defendant's testimony is not immaterial. If the Court were to credit the testimony of Defendant, his version of events tends towards the conclusion that he was detained during his interaction with Deputy Clark, and thus, the Government must at least show that Deputy Clark had reasonable suspicion to conduct a *Terry* stop. If the testimony of Deputy Clark is credited, then the encounter between Deputy Clark and Defendant would fall under the Eleventh Circuit's rubric of police-citizen encounters involving no detention or coercion. Thus, due to the conflict between Deputy Clark and Defendant's testimony, the Court must first make a credibility determination prior to ruling on the issues raised by Defendant. "When weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing." *United States v. Barrueta,* 2008 WL 4642793, at *9 (M.D. Fla. Oct. 17, 2008) (citing *United States v. Ramirez-Chilel,* 289 F.3d 744, 749-750 (11th Cir. 2002)).

In this case, having considered all the testimony of Deputy Clark and Defendant, and having perceived their demeanor while on the stand, the Court credits the testimony of Deputy Clark where it conflicts with Defendant's testimony as it relates to the encounter on June 14,

2012. At the hearing, Deputy Clark's demeanor was calm and confident as he testified. While Defendant's account of the encounter was coherent and facially plausible, the Court finds his version of events not entirely credible given Defendant's obvious interest in the outcome of these proceedings. Defendant, who faces incarceration, has a far greater motivation to fabricate his version of events than does Deputy Clark. Thus, having credited the testimony of Deputy Clark, the Court must determine whether Defendant was stopped and illegally detained by Deputy Clark in violation of Defendant's Fourth Amendment rights.

In this case, the Court finds that Defendant's Fourth Amendment rights were not violated when he was approached by Deputy Clark. Applying the factors enumerated by the Eleventh Circuit in *Miller*, a reasonable person would have felt free to terminate his or her encounter with Deputy Clark under the circumstances of this case. Defendant's path was not blocked or impeded by Deputy Clark in any way. Deputy Clark testified that he pulled his police vehicle behind Defendant as he was travelling northbound on Broadway, and that, upon parking, Defendant approached him. (Tr. 6). Deputy Clark began asking Defendant where he was going and where he was coming from. (Tr. 7); *See United States v. Perez,* 443 F.3d at 778 ("[T]he simple act of police questioning does not constitute a seizure."). Deputy Clark was the only officer present when he first contacted Defendant and Deputy Clark did not display any weapons. Deputy Clark's questioning of Defendant was very brief and he did not physically touch Defendant or his pillowcase upon making contact with him. (Tr. 7). Thus, under the totality of the circumstances, there was no show of authority that communicated to Defendant that his liberty was restrained, meaning he was not free to leave. *See id.* As a reasonable person would have felt free to leave, there was no seizure implicating the Fourth Amendment.

Deputy Clark only handcuffed Defendant upon seeing the magazine with the bullet on the hood of his patrol car after Defendant poured out the items in his pillowcase. (Tr. 8). Deputy Clark's detention of Defendant was lawful at this time. *Terry,* 392 U.S. at 24 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."). As Deputy Clark stated at the hearing, the fact that the magazine was outside the receiver of a gun did not eliminate the danger, as a bullet could still be in a gun's chamber even if a magazine is not. (Tr. 20-21). For these reasons, the Court finds that Defendant was not illegally detained by Deputy Clark.

**B. Whether Defendant's pillowcase was illegally searched by Deputy Clark**

Defendant argues that Deputy Clark did not have probable cause to support the seizure and search of the pillowcase. (Doc. 38 p. 8). The Government responds that Defendant voluntarily consented to Deputy Clark searching the contents of the pillowcase when Defendant poured the contents of the pillowcase onto the hood of Deputy Clark's patrol car. (Doc. 47 p. 7).

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." *Id.* "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Id.* (citing

*Culombe v. Connecticut,* 367 U.S. 568, 602 (1961).  "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.*  In determining whether consent was given voluntarily, courts must scrutinize the facts and strike a balance between a defendant's right to be free from coercive conduct and the legitimate need of the government to conduct lawful searches. *Id.*

As explained above, the Court credits Deputy Clark's version of events.  Deputy Clark testified that upon asking Defendant what he was doing in the area and what was in the pillowcase, Defendant, without being asked to do so, dumped all the items on the hood of Deputy Clark's patrol car.  Under these circumstances, the Court finds that Defendant's action was the result of his own free and unconstrained choice and not the result of coercion.  In fact, the circumstances of this case are far less coercive than situations under which the Eleventh Circuit has held that consent was voluntary given. *See e.g., Garcia,* 890 F.2d at 361 (holding that defendant's consent for officer's to search his home was voluntary despite being arrested in his front yard, fourteen officers were present, and the officer's threatened to obtain a search warrant); *United States v. Long,* 866 F.2d 402, 405 (11th Cir. 1989) (officers warned a suspect that if he did not consent to a search of his yard that they would come back and "dig the place up"); *United States v. Espinoza-Orlando,* 704 F.2d 507 (11th Cir. 1983) (finding that even though the defendant was lying on the ground near officials with an agent at the scene with his weapon drawn when he gave consent, defendant's consent to search his vehicle was voluntary and uncoerced).  Here, Deputy Clark simply approached Defendant and asked where he was coming from and going to, and what was in the bag.  Under the circumstances, this questioning was not so coercive as to constrain Defendant's choice.  For these reasons, the Court does not find that

Defendant's Fourth Amendment rights were violated on the grounds that his pillowcase was illegally searched.

### C. Whether, even if Defendant voluntarily consented to the search by dumping out the items in the pillowcase, that consent was tainted by the illegality of the detention

Defendant argues that even if the Court finds that Defendant voluntarily consented to the search of the pillowcase by dumping out the items within it, that consent was tainted by the illegality of the Defendant's detention. (Doc. 38 p. 8).  The Government responds that Defendant was not detained until after Deputy Clark visually examined the contents of the pillowcase, notably, the magazine with the bullet, which Defendant voluntarily emptied on the hood of the patrol car. (Doc. 47 p. 8).  Thus, the Government argues, as there was no detention prior to Defendant dumping the contents of the pillowcase, Defendant's consent could not have been tainted by his detention. (Doc. 47 p. 8).

In this case, the Court finds that Defendant was not detained at the moment that he overturned his pillowcase on the hood of Deputy Clark's patrol car.  As Defendant was not detained, his consent was not tainted by any illegal detention.  As explained above, Defendant's consent was the product of a free and unconstrained choice.  Thus, suppression is not warranted on these grounds.

### D. Whether even if Defendant voluntarily consented to the search by dumping out the items in the pillowcase, Deputy Clark commenced an illegal seizure and search by picking up and inspecting the silver magazine containing the .45 caliber bullets

Defendant argues that even if the Court finds that Defendant consented to the search by dumping out the items in the pillowcase, Deputy Clark commenced a second illegal seizure and search by picking up and inspecting the silver magazine containing the .45 caliber bullets. (Doc. 38 p. 12).  Defendant argues that there was no immediately apparent illegality in the magazine

itself as it was not illegal for Defendant to possess such an item. (Doc. 38 p. 12). Citing to *Arizona v. Hicks,* 480 U.S. 321 (1987), Defendant argues that no probable cause existed for Deputy Clark to move the magazine to see the .45 caliber bullets. (Doc. 38 p. 12).

An officer may seize evidence that is in plain view without a warrant if two elements are satisfied: "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith,* 459 F.3d 1276, 1290 (11th Cir. 2006) (citing *Horton v. California,* 496 U.S. 128, 136-37 (1990). An object's incriminating character is immediately apparent if there is probable cause to believe the object is contraband. *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993) ("If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—i.e., if 'its incriminating character [is not] "immediately apparent,"'—the plain-view doctrine cannot justify its seizure.") (citations omitted).

As explained above, the Court credits Deputy Clark who testified that he could see a bullet sticking out of the top of the magazine. (Tr. 7). Deputy Clark was lawfully located on the side of a public road and had lawful access to the magazine and bullet as they were consensually placed on the hood of his patrol car. Unlike the turntable in *Hicks,* the incriminating character of the bullet was immediately apparent without the need to conduct any further search. Thus, Deputy Clark's seizure of the bullet without a warrant falls within the plain-view exception to the warrant requirement.

Furthermore, even if Deputy Clark could not immediately see the bullet sticking out of magazine, Defendant's Fourth Amendment rights would not be violated if Deputy Clark had picked the magazine up. As Defendant assumes for the sake of argument in this section, he

consensually dumped the items of his pillowcase onto the hood of Deputy Clark's car. Deputy Clark could lawfully pick up the items placed on the hood of his patrol car in order to remove them. The Court finds no reason to require Deputy Clark to close his eyes while doing so.

For the above reasons,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress Evidence (Doc. 38) be **DENIED**.

Respectfully recommended in Chambers in Fort Myers, Florida on April 17, 2014.

*/s/ Douglas N. Frazier*
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties